# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Mar 17, 2026
s/ OH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973, currently located at Manheim Milwaukee, at 561 27th Street, Caledonia, Wisconsin (Target Vehicle 1); and In-Vehicle Infotainment (IVI) system and/or Telematics devices ofTarget Vehicle 1, as further described in Attachment A.

Case No. 26-M-334

Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ____________ District of ____________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 3-31-26 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 3-17-26. 9:30 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ________________

*Executing officer's signature*

*Printed name and title*

# ATTACHMENT A

**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. A black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973, currently located at Manheim Milwaukee, at 561 27th Street, Caledonia, Wisconsin (**Target Vehicle 1**); and

2. In-Vehicle Infotainment (IVI) system and/or Telematics devices of a black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973 (Target Vehicle 1).

## ATTACHMENT B

**Items and Information to be Seized and Searched**
**MATTER NUMBER 2024R438**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, or property designed or intended for use or which is or has been used to assist in obtaining the means of committing a criminal offense, namely violations of possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846; use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b), (hereinafter referred to collectively as the "TARGET OFFENSES);

1. Regarding the search of the Black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AWZ-6485, VIN 2C4RC1BG5PR510973 (**Target Vehicle 1**), this search warrants seeks to seize:
    a. All Applications such as any device information, connections and System Metadata retained by **Target Vehicle 1**'s telematics and infotainment systems.
    b. All Events and Navigation logs retained by the vehicle's telematics and infotainment systems.
2. Regarding the search of the electronic systems listed in item #1 above, this search warrant seeks to seize evidence of violations of possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846; use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b), (hereinafter referred to collectively as the "TARGET OFFENSES" including but not limited to:

a. Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the Subject Vehicle 1, including, but not limited to:

i. unique identifiers for the devices that connected to **Target Vehicle 1**, including cellular phones;

ii. contact lists and call logs corresponding to paired devices;

iii. media files, which could include voice and text messaging;

iv. unique identifiers for mass storage devices connected to the **Target Vehicle 1** and histories for the devices;

v. odometer readings;

**vi.** logs of phone calls; and logs for locations and routes that **Target Vehicle 1** traveled;

vii. SMS;

viii. Bluetooth connections;

ix. USB connections;

x. voice commands;

xi. voice recordings;

xii. voice calling;

xiii. web browser history;

xiv. Wi-Fi connections;

xv. speech recognition;

xvi. time updates;

xvii. track logs;

xviii. traction events;

xix. traffic updates;

xx. stop/start log;

xxi. GPS warnings;

xxii. hard acceleration;

xxiii. hard braking;

xxiv. light status;

xxv. odometer reading;

xxvi. gear shifts;

xxvii. historical navigation data;

xxviii. historical speed data;

xxix. historical event data; and

xxx. data streaming services and related content.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Mar 17, 2026
s/ OH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973, currently located at Manheim Milwaukee, at 561 27th Street, Caledonia, Wisconsin (Target Vehicle 1); and In-Vehicle Infotainment (IVI) system and/or Telematics devices ofTarget Vehicle 1, as further described in Attachment A.

Case No. 26-M-334

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 843(b); and 846. | Distribution/possession with intent to distribute controlled substances; conspiracy to do the same; and use of a communication facility in furtherance of a drug trafficking offense |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Curt R Hansen

*Applicant's signature*

Curt Hansen HSI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 3-17-26

Stephen C. Dries

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2024R438**

I, United States Department of Homeland Security Investigations (HSI) Special Agent Curt Hansen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973, currently located at Manheim Milwaukee, at 561 27th Street, Caledonia, Wisconsin (**Target Vehicle 1**), as further described in Attachment A, for any and all electronically stored information including but not limited to the **Target Vehicle 1**'s Infotainment[1] and/or Telematics[2] devices, and to search the electronic systems and the extraction of evidence as described in Attachment B.

2. I am a Special Agent of HSI, assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been employed with HSI as a Special Agent for approximately five years. Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent.

3. I have been a sworn federal law enforcement officer specifically investigating crimes involving controlled substances, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including distribution of controlled substances and human smuggling. I am

[1] "Infotainment" is the combination of information and entertainment for use within a vehicle.
[2] "Telematics" is the integration of telecommunications and information for interaction with the world outside the vehicle.

an investigator or law enforcement officer of the United States within the meaning of Title 8, United States Code, Section 1357(a)(5), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, certain offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code, and other related offenses.

4. Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. I have personally conducted and participated in numerous controlled substances, firearms, gang, and human trafficking investigations and I am familiar with the various methods that criminals use when engaging in these offenses.

5. As part of my duties, I investigate criminal violations relating to controlled substance trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns, including criminal violations of Federal firearms laws, including, but not limited to Title 18, United States Code, Sections 922, 933, and 924.

6. I have received training related to the investigations and enforcement of federal human trafficking laws including, but not limited to Title 18, United States Code, Sections 1591, 1594, and 2421. As a result of this training and my experience, I am familiar with the methods traffickers use to recruit, communicate with, and exploit their victims, like by controlled substances and the use of technology. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, and distributing sexually explicit images and videos of trafficking victims.

7. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

8. By virtue of my employment as a federal agent and prior experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into drug trafficking conspiracies, firearm offenses, and human trafficking.

b. I have interviewed witnesses, confidential human sources (CS) and sources of information (SOI) regarding drug trafficking and the distribution of monies and assets derived from drug trafficking (laundering of monetary instruments);

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement.

l. I am familiar with the language utilized over the telephone to discuss illegal firearms

and machinegun conversion devices and know that the language is often limited, guarded, and coded.

m. I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

n. I know that people engaged in the illegal possession or distribution of firearms often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

o. I have interviewed or participated in interviews of witnesses, confidential human sources (CS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

p. I have engaged in, assisted in and planned undercover operations: to include purchasing illegal substances and arrangement of sex for money transactions.

q. I have engaged in investigations of places of prostitution and drug use and know that drug traffickers will at time trade sexual favors for the payment of drug debts.

9. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization (referred hereinafter as a ("DTO") to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances for distribution or firearms for protection/intimidation. The persons higher in the DTO often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

10. I have participated in investigations that have led to the issuance of search warrants involving drug trafficking, firearms offenses, and human trafficking. These warrants involved the search of locations including residences and businesses of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the

distribution and sale of controlled substances, firearms, and/or human trafficking, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking, firearms, and/or human trafficking.

11. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substances and dealers of controlled substances, that often drug houses, also called trap houses, are established as places where a variety of drug-motivated crimes can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

12. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substances and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as

places where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store large amounts of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

13. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend people to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including to prove intent and motive, and to identify co-conspirators.

14. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular

activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting drug and/or human trafficking investigations, cellular phone data is often a key piece of evidence based on my training and experience. Individuals who sell and use controlled substances and who engage in the trafficking of others often use cell phones to set up a transaction either through traditional means (phone calls or messaging) or by use of special applications downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those individuals who engage in drug trafficking and human trafficking.

15. I am familiar with the technologies of drug traffickers and those engaged in human trafficking. I know that drug traffickers and/or human traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking and/or human trafficking operations. I know drug traffickers and/or human traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and to conduct drug trafficking and engage in human trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and with fellow traffickers and/or human trafficking victims, customers, co-conspirators, and fellow human traffickers. I know that drug traffickers and/or human traffickers often keep documents and records about drug transportation, drug sourcing, drug ordering, drug sale, drug distribution, victim information, victim posting,

posting of advertising, communication with sex trafficking customers, human trafficking proceeds, etc. These documents, records, receipts, notes, and ledgers, regarding drug trafficking and/or human trafficking are often maintained where the traffickers have ready access. These records may be stored within computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers and/or human traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, their drug proceeds, their trafficking victims, and/or customers. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

16. I am familiar that drug traffickers and those engaged in human trafficking often use vehicles in order to conduct their criminal conduct. I know that drug traffickers and/or human traffickers often use vehicles to travel to drug customers/human trafficking customers, locations where drug and/or drug proceeds are stored/stash houses or trap houses, and drug sources. I know that with advancement in technologies, vehicles can be equipped with tracking systems that record and store the historical travel conducted by a vehicle. Therefore, I know this historical information could include locations of customers, stash houses/trap houses, or drug sources in relation to drug trafficking and engage in human trafficking.

17. I am currently participating in an investigation of the TARGET DTO and its members and associates. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) recorded jail calls which, prior to the parties' discussion, provided a warning that the calls would be recorded; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) information obtained from witnesses, including confidential sources and undercover agents; (e) administratively subpoenaed and court ordered records; and (f) court authorized wire and electronic intercepts.

18. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

19. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that possible crimes of:

a. possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1);
b. conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846;
c. use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b); and
(hereinafter referred to collectively as the "TARGET OFFENSES")

have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN (DOB: 08-16-76), Jermaine A. ERVING, and other persons as yet unknown (hereinafter "TARGET SUBJECTS"). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

**TIII Authorization**

20. On December 19, 2025, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 439-8361, used by LOPEZ and initial interception of wire communications to and from (414) 639-1158, used by LOPEZ. On January 16, 2026, interceptions of (414) 439-8361 and (414) 639-1158 were extended and are set to end on February 14, 2026. On January 16, 2026, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 732-3682, used by STAIR, which was set to expire on February 14, 2026. On February 13, 2026, interceptions of (414) 732-3682 was extended and are set to end on March 14, 2026.

**PROBABLE CAUSE**

**A. Background**

21. Since May 2024, HSI has been investigating allegations that members of the DTO are conspiring with each other, and other individuals yet unknown, to operate stash houses and trap houses for the purpose of storing and distributing controlled substances in Milwaukee, Wisconsin, and using numerous properties owned by STAIR to engage in their conduct.

22. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as CS#1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

23. Special Agents of HSI, case agents and local officers have received information concerning the illegal drug trafficking activities of members of the TARGET DTO from confidential human sources (CS #1 and CS #2):

a. CS #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS #1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS #1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS #1's cooperation, on May 30, 2025, CS #1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to CS #1's cooperation agreement. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #1 is credible and that CS #1's information is reliable notwithstanding CS #1's violation of CS #1's cooperation agreement.

b. CS #2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS #2 began cooperating with HSI. CS #2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS #2 is now cooperating in exchange for monetary consideration. To date, CS #2 has received one monetary payment of $5,000 for CS #2's cooperation with HSI. Certain information provided by CS #2 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law

enforcement databases. CS #2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS #2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS #2's cooperation with the law enforcement officer with whom CS #2 was working in exchange for third-party consideration. The officer indicated that CS #2 has provided reliable cooperation with that agency and believes that CS #2 is reliable. At no time during CS #2's cooperation with HSI have I found CS #2 to have provided false information or engaged in untruthful or deceptive behavior. As further detailed below, during controlled operations, the basis of CS #2's information has been confirmed by case agents and determined to be truthful and reliable. Further, CS #2's information is based on CS #2's own personal observations and participation in surveilled controlled operations. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #2 is credible and that CS #2's information is reliable. CS #2 is currently cooperating with law enforcement.

24. At various times between April 2025, and February 2026, United States Magistrate Judges for the Eastern District of Wisconsin have authorized the use of pen registers and trap and trace devices for DTO telephone lines. At various times between April 2025, and January 2026, United States Magistrate Judges for the Eastern District of Wisconsin have signed orders for prospective precision location data (pings) for DTO telephone lines.

25. As part of the investigation, case agents have reviewed numerous recorded jail calls between in custody inmates and MCDADE and recorded jail calls between in custody inmates SINCLAIR, LOPEZ and STAIR. Case agents have identified MCDADE, SINCLAIR, STAIR, and

LOPEZ by their voices, names, and other facts shared in the recordings that are consistent with MCDADE, SINCLAIR, STAIR, and LOPEZ. Case agents also identified STAIR's telephone number as (414) 732-3682; LOPEZ's telephone numbers as (414) 439-8361 and (414) 639-1158; and BOFFIL's telephone number as (262) 234-8917, further outlined below.

26. Based on training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as CS#1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

**B. MCDADE Investigation and Arrest**

27. STAIR is the owner and operator of S2 Real Estate as well as at least 43 Limited Liability Companies in similar names. STAIR, though his LLCs, owns more than 100 rental properties throughout the greater Milwaukee area.

28. STAIR, through S2 Real Estate, employs LOPEZ and others.

29. Since approximately May 2024, case agents have been investigating the DTO, which has been connected to several overdose deaths and appears to be connected to MCDADE.

30. The DTO has been identified as operating out of multiple residences owned by STAIR through his limited liability companies. As part of the investigation into the DTO, case agents have identified that STAIR and LOPEZ knowingly rents properties to drug traffickers for the purpose of storing and/or selling controlled substances.

31. As part of the investigation, case agents have identified several properties owned by STAIR, which have operated as trap houses or been otherwise involved in the distribution and storage of controlled substances including 712 South 21st Street Milwaukee, Wisconsin, 1512 South 21st Street, Milwaukee, Wisconsin (the "21st Street House") and 1425 West Greenfield Avenue, Milwaukee, Wisconsin (the "14th Street House"). Case agents have connected MCDADE to several of these trap houses.

32. As detailed below, as part of the investigation into MCDADE, case agents obtained several warrants authorizing agents to collect data pertaining to the locations of telephones used by MCDADE (414) 514-3794 and (414) 439-7468. Case agents subsequently reviewed data between June 6, 2025, and June 14, 2025. Data pertaining to the locations of (414) 514-3794 and (414) 439-7468 revealed that MCDADE's telephones traveled from Milwaukee, Wisconsin to the Chicago area five times in the span of nine days. Case agents observed telephones (414) 514-3794 and (414) 439-7468 remained in the Chicago area for a short period of time before returning to Wisconsin.

33. On June 6, 2025, June 9, 2025, and June 11, 2025, the cell phone locations show that these two phones traveled from Milwaukee, WI, to the south side of Chicago, IL, specifically to the area of W. 63rd Street and S. Halstead Street in Chicago.

34. Case agents reviewed court-authorized cellular telephone records and location data for each of the dates MCDADE traveled to W. 63rd Street and S. Halstead Street in Chicago and MCDADE. Case agents observed that one of the phone numbers MCDADE was in contact with on June 11, 2025, was (773) 981-6881. Case agents know 773 is an area code that serves the Chicagoland area. A search of law enforcement databases (Accurint and TLO) revealed (773) 981-6881listed to Jermaine A. ERVING (DOB: XX/XX/1976) of 6318 S. Aberdeen Street, Chicago, IL. In addition, a query of CashApp revealed (773) 981-6881 was affiliated with username of "Jermaine." Case agents are aware 6318 S. Aberdeen Street is in the immediate area near where MCDADE's two cellular telephones, (414) 514-3794 and (414) 439-7468 were located each time MCDADE traveled to Chicago.

35. Case agents are also aware MCDADE's cellular telephones, (414) 514-3794 and (414) 439-7468, traveled along the Illinois Tollway. Case agents compared the locations of the cell phones (414) 514-3794 and (414) 439-7468 information to an Illinois Tollway map and identified a cell location record showing the phones (414) 514-3794 and (414) 439-7468 passing Toll Plaza 21 on June 6, 2025, June 9, 2025, and June 11, 2025. Case agents contacted an employee with the IL Tollway who ran a license plate query from the toll cameras for the vehicles associated with MCDADE during that time. On June 9, 2025, when the cell phone location shows that MCDADE's phones were passing through Toll Plaza 21, the toll cameras captured Wisconsin license plate AZY-8870 crossing the toll station. Case agents reviewed Wisconsin Department of Transportation

(WIDOT) records and observed the license plate was registered to Max Berzowski DOB: XX/XX/1971 with no vehicle associated with the plate. As detailed below, case agents are aware through previous surveillance that the vehicle bearing Wisconsin license plate AZY-8870 was linked to MCDADE and MCDADE had been observed as a passenger in this vehicle bearing Wisconsin license plate AZY-8870 on previous occasions. Like on May 27, 2025, case agents observed MCDADE exit 1425 W. Greenfield Avenue and enter the driver's seat of AZY-8870. Case agents are aware MCDADE uses vehicles registered in other persons names to avoid detection from law enforcement while procuring and/or distributing narcotics.

36. On June 6, 2025, at approximately 12:14 a.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 appeared to depart near Lake Forest, IL. At approximately 12:59 a.m. MCDADE's telephones (414) 514-3794 and (414) 439-7468 were both in the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 1:29 a.m., the telephones (414) 514-3794 and (414) 439-7468 appeared to head towards Milwaukee, WI from the Englewood Neighborhood and arrived in the area of Milwaukee around 3:00 a.m. Based on the investigation into MCDADE, case agents believe the trip began in Milwaukee, WI, similar to subsequent trips listed below; however, data from court authorized electronic surveillance did not have information as to the locations of telephone numbers (414) 514-3794 and (414) 439-7468 prior to the departure at 12:14 a.m. from Lake Forest, Illinois.

37. On June 9, 2025, on his route back from Chicago to Milwaukee, MCDADE's cellular telephones (414) 514-3794 and (414) 439-7468 and a vehicle with Wisconsin license plate AZY-8870 passed through the tollway at Plaza 21 at the same time. Additionally, law enforcement databases show the vehicle with Wisconsin license plate AZY-8870 located in the area of I-90

Expressway and W. 59th Street on June 8, 2025, at 11:36 p.m. which corresponds with the location of MCDADE's cellular telephones (414) 514-3794 and (414) 439-7468 at that time.

38. Case agents reviewed court authorized electronic surveillance for telephone numbers for MCDADE's cellular telephone numbers (414) 514-3794 and (414) 439-7468 on June 8, 2025, at approximately 9:00 p.m. departed the Milwaukee, Wisconsin area. At approximately 11:10 p.m., MCDADE's telephones arrived at the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 11:40 p.m., both telephones left the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. Then on June 9, 2025, at approximately 2:00 a.m., MCDADE's telephones returned to the Milwaukee, Wisconsin area.

39. Case agents reviewed recorded jail calls for inmate pin # for Amber L. Valadez to MCDADE's number of (414) 514-3794 placed on June 9, 2025, at approximately, 8:01 a.m. (38811067_553878_06-09-2025_08-01-25_1-(414) 514-3794_4901). Detective Sharif Said reviewed this call and recognized the voice of the male who answered the phone as MCDADE. During this call, approximately 1 minute and 26 seconds into the recording, MCDADE stated that he was in Chicago, IL and he was busy. Case agents believe this was a reference to MCDADE traveling to Chicago, IL the night of Jun 8, 2025, and returning during the early morning hours of June 9, 2025.

40. On June 11, 2025, at approximately 2:00 a.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 departed the Milwaukee, WI area. At approximately 3:35 a.m., the telephones appeared to have arrived at the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 4:05 a.m., both telephones (414) 514-3794 and

(414) 439-7468 left the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. On June 11, 2025, at approximately 6:00 a.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 returned to Milwaukee, Wisconsin.

41. Also on June 11, 2025, at approximately 6:10 a.m., case agents conducted surveillance and captured on video a Chevy Trax with Wisconsin license plate AVU-4071. Case agents reviewed WI DOT records and observed the vehicle was registered to Megan Morgan, DOB: 02/01/1986 on a silver 2020 Chevy Trax. The vehicle was parked directly in front of 1425 W. Greenfield Avenue, Milwaukee, WI, the same location where MCDADE conducted controlled drug buy with CHS #1 on May 20, 2025. Case agents observed a black male and a white female exit the front of 1425 W. Greenfield Avenue and enter the Chevrolet Trax. Case agents then reviewed plate readers in the Chicago, IL area and determined that the Trax was captured by photograph on June 11, 2025, at 3:56 a.m. by plate readers on the Dan Ryan Expressway at 59th Street in Chicago, IL. This was also consistent with location data which revealed at that time that MCDADE's telephones (414) 514-3794 and (414) 439-7468 were in the area of the Dan Ryan Expressway at 63rd Street at 3:50 a.m. and 3:51 a.m., respectively.

42. Also on June 11, 2025, while conducting surveillance at 1425 W. Greenfield Avenue, Milwaukee, WI, case agents observed individuals entering and leaving the address, and entering the aforementioned black Minivan, bearing Wisconsin license plate AZY-8870, as previously noted is registered to Berzowski.

43. On June 13, 2025, at approximately 12:42 p.m., MCDADE's telephones departed the Milwaukee, WI area. At approximately 3:22 p.m., the telephones arrived at the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At

approximately 5:29 p.m., both telephones left the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. On June 13, 2025, at approximately 9:41 p.m., both of MCDADE's telephones, (414) 514-3794 and (414) 439-7468, returned to Milwaukee, WI.

44. On June 14, 2025, at approximately 8:13 p.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 departed Milwaukee, WI. At approximately 9:29 p.m., the telephones arrived in area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 10:14 p.m., MCDADE's telephones, (414) 514-3794 and (414) 439-7468, left the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago IL and returned to the Milwaukee, WI area at approximately 12:18 a.m. on June 15, 2025.

45. Based on training and experience, case agents know that frequent short trips, like the ones described above, are consistent with drug trafficking, more specifically, consistent with those engaged in picking up larger amounts of controlled substances to distribute. Based on the aforementioned information, case agents believe MCDADE, and others, were travelling to Chicago, IL to procure large quantities of narcotics to transport back to WI in order to distribute them. Case agents are also aware MCDADE uses multiple phones to either procure and/or distribute narcotics. Case agents have reviewed court authorized cellular phone location data from (414) 514-3794 and (414) 439-7468 and observed both phones consistently at the same locations in proximity while traveling.

46. On October 14, 2025, MPD executed a state search warrant at the 14th Street house, which was identified as a trap house used by MCDADE. MPD observed MCDADE, an associate of STAIR and LOPEZ, arrive at the 14th Street House as a passenger in a Chevy Trailblazer, bearing Wisconsin license plate BBF-3776 (Trailblazer) shortly before the execution of the warrant.

47. When MPD executed the warrant, MCDADE and others inside the trap house at the 14th Street House attempted to flee out of a window. MPD arrested MCDADE around 11:41 p.m. Located on MCDADE was $2,097; a smart flip phone blue Motorola razor with a brown case with stripes; and a black Apple iPhone in a black case.

48. Inside the 14th Street house, MPD located more than 140 grams of a substance that field tested positive for cocaine and 90 grams of a substance that field tested positive for fentanyl from a trash can near where MCDADE and others attempted to jump out the window. MPD also located: a Phoenix Arms Raven .25 caliber handgun, numerous ammunition; a gray Samsung touch screen cellphone with a black case; a gray Samsung touch screen cellphone with a black and pink case; digital scales; drug paraphernalia; suspected drug ledger, and items consistent with cooking crack cocaine. Also located inside the 14th Street House was a camera surveillance system, including DVR systems. The surveillance system located by MPD was consistent with the surveillance system CS#2 described to case agents. MPD also located a document with MCDADE's name on it in a bedroom. Law enforcement also found thousands of hypodermic needles and over a dozen nasal doses of Naloxone, which is used to counter the effects of an overdose. Based on training and experience, I believe that the items located at the 14th Street House are consistent with the residence being used as a trap house.

49. MCDADE was charged in Milwaukee County Case 2025CF4892 for drug related offenses and has remained in custody since his arrest.

50. While MCDADE has been incarcerated at the Milwaukee County House of Corrections, case agents have reviewed recorded jail calls with individuals identified as Victoria ALLEN, Allyse D. JONES, and others. These calls revealed that members of the DTO are

continuing to procure and distribute narcotics on MCDADE's behalf while he is in custody. Based on the phone calls below, case agents believe JONES, ALLEN, and others are procuring narcotics from the same supplier located in Chicago, IL that MCDADE procured narcotics from prior to his arrest. Case agents previously identified the suspected source of supply for MCDADE as Jermaine ERVING (DOB: XX/XX/1976) who uses (773) 981-6881. Case agents used electronic and physical surveillance of MCDADE's cellular telephones showing MCDADE traveled to Chicago, IL numerous times late at night and in the early morning hours and returned directly to Milwaukee after meeting at, or near, ERVING's residence at 6318 S. Aberdeen Drive, Chicago, IL.

51. Case agents received a toll record return for (612) 525-0135 and observed on December 24, 2025, (612) 525-0135 made an outgoing call for two seconds at 10:14:07 am to telephone (773) 981-6881) believed to be used by ERVING. At 10:18:38 am telephone (773) 981-6881 (ERVING's telephone) called JONES's telephone, (612) 525-0135, with a duration of 4 minutes 39 seconds. Based on the investigation into the DTO, case agents believe that DTO members appear to contact ERVIN's telephone (773) 981-6881 in order to arrange drug trafficking transactions.

52. Case agents reviewed license plate reader activity regarding the license plate VK5729 (Target Vehicle 2) being driven by JONES and observed that on December 29, 2025, the license plate was captured while driving through Fond Du Lac County at #12 Hwy 67 at Ashland Drive eastbound. Target Vehicle 2 was captured at 12:19:17 pm and again at 12:30:08 pm. Based on the investigation into the DTO, cases agents were aware the MCDADE has several drug customers in the Fond Du Lac area. Therefore, based on training, experience, and the investigation into the DTO, case agents believe the prior contacts on December 24, 2025 between ERVING's telephone (773)

981-6881 with JONES's telephone, (612) 525-0135 and then the travel of Target Vehicle 2 several days later, is consistent with ERVING selling MCDADE's DTO controlled substances and then MCDADE's DTO using Target Vehicle 2 to deliver narcotics to MCDADE's customers north of Milwaukee.

53. Based on recorded jail calls, physical surveillance, and license plate reader technology, case agents believe JONES and ALLEN are supporting MCDADE in the procurement and distribution of narcotics from ERVING for the MCDADE DTO.

54. On December 31, 2025, at approximately 5:19 p.m., case agents conducted surveillance at 6408 North 73rd Street, Milwaukee, Wisconsin and observed Allyse JONES park a gray, 2014 Nissan Pathfinder, bearing Wisconsin license plate VK5729 (Target Vehicle 2). Case agents were aware that JONES was in contact with MCDADE (in custody) and EVRING, as described in more detail below. Case agents reviewed WI DOT records which indicated the Target Vehicle 2 is registered to Virgil E. ERBY DOB: XX/XX/1966 of 3430 W. Wisconsin Ave #416, Milwaukee Wisconsin with a VIN of 55N1AR2MN0EC698011. Case agents observed JONES exit Target Vehicle 2 and then enter her residence at 6408 N. 73rd Street. Case agents are aware that when MCDADE was not in custody, MCDADE would use vehicles registered to ERBY to distribute narcotics throughout Southeastern Wisconsin. Case agents are also aware MCDADE would distribute the narcotics north of Milwaukee in Fond du Lac County, Wisconsin.

55. Case agents believe JONES is the user of (612) 525-0135 because: (1) In review of recorded jail calls with MCDADE and (612) 525-0135, MCDADE identifies the user of (612) 525-0135 as "A"; (2) A query of TLO, a law enforcement database revealed that (612) 525-0135 is affiliated with JONES; (3) During contact with the Racine (WI) Police Department on June 1, 2025

(Activity #25-024644), JONES provided her number as (612) 525-0135; and (4) Case agents have reviewed recorded video jail calls between MCDADE and (612) 525-0135 and identified the user of (612) 525-0135 during these recorded video jail calls as JONES, based on capering the user of (612) 525-0135 in the video against JONES' driver's license photograph. Case agents have reviewed jail communications between MCDADE and (612) 525-0135 recently as February 23, 2026, and believe that JONES is still the primary user of this phone.

**C. MCDADE's Jail Calls and Ongoing Drug Trafficking**

56. Case agents have reviewed jails calls from MCDADE's PIN since MCDADE has been in custody at the Milwaukee County Jail. Case agents reviewed a jail call made on October 20, 2025, from MCDADE's PIN to telephone number (262) 234-8917. As detailed above, I am familiar with MCDADE's voice and can identify MCDADE as the inmate placing this call. During the call, MCDADE referred to the user of (262) 234-8917 as "Nephew." Based on this investigation, case agents identified "Nephew" as BOFFIL. During this call, MCDADE directed BOFFIL to contact STAIR.

57. Case agents identified and listened to a subsequent call between BOFFIL and MCDADE on October 20, 2025. In that call, MCDADE asked whether BOFFIL "talked to him?" Based on the investigation into the DTO and the fact that BOFFIL contacted STAIR later in this call, I believe that MCDADE was referring to STAIR when MCDADE asked about "…him…". BOFFIL confirmed that he had spoken with him. BOFFIL explained that STAIR discussed how there was damage to the house when "the crackhead went out the window." Based on the investigation into the DTO, this statement is consistent with when several people, including MCDADE, attempted to flee out the window of the 14th Street House during the execution of a

search warrant. Further, based on my training and experience, the term "crackhead" is often used to describe a person who uses crack cocaine.

58. During the October 20, 2025, call between BOFFIL and MCDADE, MCDADE directed BOFFIL to call STAIR on another phone. BOFFIL did so, and case agents could hear STAIR on the recorded jail call. As detailed above, I am familiar with STAIR's voice and am able to recognize STAIR as the person with whom MCDADE spoke on this call. Further, during the call, MCDADE referred to him as "Sam." Based on this, I believe BOFFIL contacted STAIR using BOFFIL's phone to avoid law enforcement detection, as directed by MCDADE. STAIR stated to MCDADE, "Man, I gave you a heads up that...ah, there's so much drama going on" and MCDADE spoke over STAIR and cut STAIR off stating, "Sam, Sam, quit talking over the phone." Based on my training, experience, and investigation into the DTO, I believe STAIR statements relate to STAIR attempting to warn MCDADE when trap houses are being watched by law enforcement, specifically 1425 West Greenfield Avenue ("Man, I gave you a heads up that...ah, there's so much drama going on"). Further, I believe that given MCDADE's knowledge of law enforcement investigation techniques, he is attempting to stop STAIR from making incriminating admissions on the record jail call ("Sam, Sam, quit talking over the phone"). MCDADE and STAIR continued discussing matters.

59. After concluding the conversation with STAIR, MCDADE directed BOFFIL to call "Jeanette." Case agents then heard a female voice on the phone determined to be LOPEZ based on case agents' familiarity with LOPEZ's voice as documented above and from court authorized wire intercepts.

60. During the call, MCDADE directed LOPEZ to "go somewhere where I can rap with you real quick." LOPEZ responded, "I'm by myself." During the conversation, MCDADE asked

LOPEZ to talk with “dude” and indicated that MCDADE just spoke with him on the phone and says “Sam”. I believe this involved MCDADE speaking with STAIR and then discussing that conversation with LOPEZ. During the call, MCDADE, LOPEZ, and BOFFIL discussed STAIR helping MCDADE with his bail. LOPEZ stated, “he should have been 10 steps ahead.” Based on training, experience, and the investigation into the DTO, I believe that LOPEZ’s statement referred to STAIR warning MCDADE regarding the police coming to search the 14th Street House. They also discussed getting money back from the deposit and selling a car.

61. Case agents reviewed call detail records for October 20, 2025, at approximately 12:08 p.m., when BOFFIL contacted STAIR for MCDADE. Case agents observed BOFFIL’s telephone number (262) 234-8917 contacted STAIR’s telephone (414) 732-3682 on October 20, 2025, at approximately 12:09 p.m. Further, after the call between MCDADE, BOFFIL and STAIR, case agents observed that BOFFIL’s telephone number (262) 234-8917 contacted LOPEZ at (414) 439-8361 to discuss the drug trafficking operation, as recorded on the jail call.

62. Based on my training and experience, I believe this recorded jail call is consistent with STAIR, LOPEZ, BOFFIL, and MCDADE conspiring to engage in drug trafficking and STAIR attempting to warn MCDADE when trap houses are being watched or targeted by law enforcement.

63. On November 12, 2025, at approximately 7:20 p.m., MCDADE called Shirtreal ROBY at (414) 252-8847 from the Milwaukee House of Correction (Jail call # 740505968_2025018513_11-12-2025_19-20-51_1-414-242-8847).

64. Case agents believe ROBY is the user of (414) 242-8847 because: (1) In review of recorded jail calls with MCDADE and telephone number (414) 242-8847, MCDADE identifies the user of (414) 242-8847 as “Shirtreal”; and (2) A query of TLO, a law enforcement database revealed

that (414) 242-8847 is affiliated with ROBY. Case agents have reviewed jail communications between Russell MCDADE and (414) 242-8847 as recently as February 2, 2026, and believe that ROBY is still the primary user of this phone.

65. Durning the record jail call, ROBY advised that she was going to text "them," but he said, "don't text my number to nobody and you don't give no number, my number, to nobody because you give it to him directly." MCDADE appeared to change the conversation and asked ROBY how her son was doing. ROBY explained how her son was suspended from school and kicked off the school bus. MCDADE asked for the number that he was trying to get, and ROBY told MCDADE the phone number was Target Cell Phone 7. As mentioned previously, this number was affiliated with ERVING. MCDADE later told ROBY that he was going text Maria on the "tablet" the next day and ROBY said that Maria had called her and talked about some "green cards." Case agents believe Target Cell Phone 7 is used by MCDADE's narcotics supplier from Chicago, Illinois.

66. On November 21, 2025, at 8:21 a.m., MCDADE used a House of Corrections tablet to send a message to JONES at (612) 525-0135. MCDADE's PIN texted JONES, "Good morning bae waiting on the phones to come on I love u bae this cuz number, (773) 981-6881 (ERVING's telephone number) face time when I call". From previously recorded phone calls, case agents know JONES would not talk to ROBY directly and was looking for MCDADE's supplier's phone number, (773) 981-6881 (ERVING's telephone number).

67. On January 9, 2026, at approximately 8:13 p.m., MCDADE called Victoria ALLEN at (262) 330-2333 from the Milwaukee House of Corrections (Jail call # 743521914 _2025018513_01-09-2026_20-13-47_1-262-330-2333).

68. Case agents believe ALLEN is the user of (262) 330-2333 because: (1) In review of

recorded jail calls with MCDADE and telephone number (262) 330-2333, MCDADE identifies the user of (262) 330-2333 as "Victoria"; (2) A query of TLO, a law enforcement database revealed that (262) 330-2333 is affiliated with ALLEN; and (3) a query of CashApp revealed (262) 330-2333 is affiliated to "Victoria Allen." Case agents have reviewed jail communications between MCDADE and (262) 330-2333 as recently as February 9, 2026, and believe that ALLEN is still the primary user of this phone.

69. ALLEN stated, "I'm on my way to Chicago, he just told us to come on now." MCDADE told ALLEN to be safe. MCDADE then told ALLEN that he spoke to "Nephew" and told "Nephew" that he owed "Vicky" an apology. MCDADE then said that "J-Rock" was over at that lady "J-Lo" house and the "feds" ran in his house earlier and "Y'all gotta keep that nigga away from y'all." MCDADE later said that he "J-Rock" was running because he owed "Nephew" some money. MCDADE asked ALLEN if anybody had an extra phone near her and ALLEN could be heard in the background trying to get an additional phone. MCDADE asked if "old girl" gave her some money and ALLEN stated, "Yep, she gave me U/I three hundred." MCDADE asked if she ("old girl") was at the house and ALLEN replied she was not and was at "Greenfield." MCDADE then called her a "stupid ass."

70. Based on the investigation to date, case agents believe MCDADE sent others including, but not limited to, ALLEN and JONES to Chicago, IL to obtain narcotics from MCDADE's source of supply. As previously mentioned, case agents believe MCDADE's source of supply utilizes telephone number (773) 981-6881 which is affiliated with ERVING. These individuals then transport the narcotics to the greater Milwaukee area for further distribution. Therefore, in this call, case agents believe ALLEN told MCDADE that she was on her way to

Chicago to meet with MCDADE's source of supply to obtain narcotics because ERVING instructed ALLEN to drive there ("I'm on my way to Chicago, he just told us to come on now").

71. Case agents conducted telephone toll analysis on ALLEN's telephone number, (262) 330-2333. Case agents observed that, on January 9, 2026, ALLEN's telephone number, (262) 330-2333 was in contact with ERVING's telephone (773) 981-6881 18 times from approximately 4:23 p.m. through approximately 10:05 p.m. Case agents conducted a query of the WIDOT and discovered that ALLEN is the registered owner of a black 2023 Chrysler Pacifica, bearing Wisconsin license plate AZW-6485, VIN: 2C4RC1BG5PR510973 (**Target Vehicle 1**). Therefore, case agents conducted a query of license plate readers in the Chicagoland area. This query identified that on June 9, 2026, **Target Vehicle 1** was traveling southbound on I-90 at W. Chicago Avenue in Chicago, IL at approximately 9:43 p.m. Per the license plate readers, Target Vehicle continued southbound and was ultimately observed southbound on I-90 at W. 59th Street at approximately 9:51 p.m., which was the southernmost license plate reader that captured **Target Vehicle 1**. Approximately 17 minutes later, at 10:08 p.m., **Target Vehicle 1** was observed traveling northbound on I-90 at W. 59th Street. A query of the WIDOT revealed ERVING's address on his Illinois driver's license is listed as 6318 S. Aberdeen Street, Chicago, IL, which is near the license plate reader at I-90 and W. 59th Street. As mentioned in the previous paragraph, the were 18 calls between Target Cell Phone 8 and Target Cell Phone 7 on January 9, 2026. Among these, some of the calls were as follows:

a. 9:46 p.m.: (262) 330-2333 outgoing to (773) 981-6881;
b. 9:52 p.m.: (262) 330-2333outgoing to (773) 981-6881;
c. 10:02 p.m.: (262) 330-2333 incoming from (773) 981-6881; and
d. 10:05 p.m.: (262) 330-2333 outgoing to (773) 981-6881.

72. Therefore, based on the recorded jail call during which ALLEN told MCDADE, "I'm

on my way to Chicago, he just told us to come on now," as well as license plate reader for Target Vehicle1 and telephone toll data between ALLEN's telephone (262) 330-2333 and ERVING's telephone (773) 981-6881, case agents believe ALLEN, driving **Target Vehicle 1** traveled to, or near, ERVING's residence to meet with ERVING and obtain narcotics, then traveled back northbound to the greater-Milwaukee area. In addition, case agents believe ALLEN used her phone, (262) 330-2333, to communicate with ERVING at (773) 981-6881 and coordinate this meeting.

73. On January 10, 2026, at approximately 9:54 a.m., MCDADE called ALLEN at (262) 330-2333 from the Milwaukee House of Corrections (Jail call # 7435301310 _2025018513_01-10-2026_09-54-46_1-262-330-2333). An unidentified male (UM) answered the phone and MCDADE asked if ALLEN was asleep. The UM advised that ALLEN was asleep and asked MCDADE if he should wake her up. MCDADE told UM to wake ALLEN up and then asked, "Y'all make it back safe?" The UM replied, "Yeah, yeah, [U/I] everything good." ALLEN then got on phone and said, "Hello." MCDADE laughed and suggested how tired ALLEN must be. MCDADE stated, "Yeah, that's good you all met him. You met him, huh? He cool?" ALLEN acknowledged, "Uh-huh." MCDADE said, "Yeah, he cool." As the call continued, MCDADE asked ALLEN if she found the "thingy" yet and ALLEN stated that she thought somebody put it in her closet and would look for it.

74. Based on this call, case agents believe the UM traveled to Chicago with ALLEN to meet with ERVING to obtain controlled substances the previous day. MCDADE asked the UM if the UM made it back from Chicago safely ("Y'all make it back safe?") and the UM confirmed they did ("Yeah, yeah, [U/I] everything good"). Furthermore, once ALLEN got on the phone, MCDADE confirmed that ALLEN and the UM met with ERVING ("Yeah, that's good you all met him. You

met him, huh? He cool?") and ALLEN confirmed they had.

75. On January 18, 2026, at approximately 11:22 a.m., MCDADE called ALLEN at (262) 330-2333 from the Milwaukee House of Corrections (Jail call # 743939236 _2025018513_01-18-2026_11-22-10_1-262-330-2333). At approximately 9 minutes 52 seconds into the call, ALLEN asked MCDADE, "Who supposed to be goin' up north with Ra Ra?" MCDADE replied, "I don't know, shit. Who going?" ALLEN replied, "Not me." MCDADE stated, "You going to take that ride." MCDADE then stated, "Ask him, ask him who there." ALLEN was talking to somebody in background and ALLEN stated, "Uncle Junior." MCDADE replied, "Yeah, they can go." ALLEN told MCDADE, "They gotta take a phone." At 10 minutes 58 seconds MCDADE asked, "What time they leaving today? What time they leaving?" ALLEN asked, "Huh?" MCDADE repeated, "What time they leaving?" ALLEN advised, "I don't know, I gotta get them a phone first, cause they ain't finna use my shit." ALLEN then stated, "But then again, they can, 'cause I ain't gotta do nothing but sleep all while the going up there." ALLEN then yelled in background, "Y'all can take my phone U/I."

76. Based on the investigation thus far, case agents believe MCDADE has individuals transport narcotics to the Campbellsport area (Fond du Lac County), which is north of Milwaukee. Therefore, case agents believe MCDADE inquired as to who was going to transport the narcotics to Campbellsport ("Who supposed to be goin' up north with Ra Ra?"). ALLEN advised she was not going ("Not me") but eventually indicated that whoever does go can utilize her phone ("Y'all can take my phone U/I").

77. On January 19, 2026, at approximately 7:28 p.m., MCDADE called ALLEN's phone, (262) 330-2333, from the Milwaukee House of Correction (Jail call # 744027894 _2025018513_01-

19-2026_19-28-35_1-262-330-2333). A UM answered and MCDADE identified the UM as "Uncle Junior." Case agents are still attempting to fully identify "Uncle Junior." Throughout the call, case agents heard that MCKNIGHT was with another individual, whom MCDADE referred to as "Brother-in-Law." Case agents believe "Brother-In-Law" is Kerry HOWELL (DOB: XX-XX-54), who was previously identified during a West Allis PD investigation into an overdose death (Case #24-017511). "Uncle Junior" advised, "We almost up there, man." MCDADE asked, "How far y'all away?" "Uncle Junior" advised, "He had a problem with the tire." MCDADE again asked, "How far y'all away?" and the "Uncle Junior" advised, "About seven miles." MCDADE said, "Damn, you ain't gonna be there before 7:40, huh?" "Uncle Junior" said they were about ten minutes away. MCDADE told UM that he might as well stay on the phone. "Uncle Junior" soon advised that they were getting off at the next exit. MCDADE then spoke to somebody in the background and asked who was next on the phone. Then MCDADE stated, "This an important call, I'm gonna have to give him like ten dollars on the canteen. I need this call." "Uncle Junior" advised, "We getting off now." "Uncle Junior" asked MCDADE how many minutes he had left and MCDADE tells UM he has about ten minutes. MCDADE clarifies with "Uncle Junior" about if they just exited and that they are probably five minutes from the house. "Uncle Junior" confirmed they were five minutes away.

78. At 12 minutes 22 seconds into the call, "Uncle Junior" said, "We here." MCDADE acknowledged, "Okay." In the background, case agents could hear a horn honking and MCDADE asked if "Uncle Junior" was going in and "Uncle Junior" said this was his first time up there. As the call continued, it sounded to case agents as if "Uncle Junior", and HOWELL were attempting to make contact with "Lisa" and/or "Bird" inside a residence. Case agents are still attempting to more

fully identify "Lisa." At one point, an individual identified as "Tom" arrived and assisted "Uncle Junior" and HOWELL with making contact with "Lisa" and "Bird." Eventually, they were able to get in contact with "Lisa" who then spoke on the phone with MCDADE. Soon thereafter, MCDADE reached the time limit on his call and the call ended.

79. Based on the investigation thus far and recorded jail calls between MCDADE and "Lisa," case agents believe "Lisa" is a narcotics customer of MCDADE's. Therefore, case agents believe "Uncle Junior" and HOWELL took ALLEN's phone, Target Cell Phone 8, with them as they drove to Campbellsport, Wisconsin to deliver narcotics to "Lisa."

80. On January 21, 2026, at approximately 3:04 p.m., MCDADE called ALLEN at (262) 330-2333, from the Milwaukee House of Correction (Jail call # 744102904_2025018513_01-21-2026_15-04-25_1-262-330-2333). At about 9 minutes 8 seconds into the call, ALLEN said, "I gotta wait, cuz uh, this weekend I'mma send "Brother-in-Law" to Chi-Town." MCDADE acknowledged. ALLEN continued, "Yeah, so I have to get him straight." MCDADE stated, "Ask Brother-in-Law and Uncle Junior, can they go up, go, go, go up that way [U/I] tomorrow or Friday." ALLEN asked, "Where?" MCDADE replied, "Up there where they went." ALLEN said they could not because she and "Brother-in-Law" were going to see Lola tomorrow.

81. As mentioned previously, case agents believe "Brother-in-Law" is HOWELL, and that "Chi-Town" is a nickname for Chicago, IL. Therefore, case agents believe ALLEN informed MCDADE that HOWELL would travel to Chicago that weekend to obtain narcotics from ERVING (this weekend I'ma send "Brother-in-Law" to Chi-Town"). MCDADE asked if HOWELL and "Uncle Junior" could travel to Campbellsport the next day or Friday to deliver narcotics to "Lisa" and/or obtained narcotics-related proceeds from her.

82. Case agents believe MCDADE continues to utilize other individuals to obtain and

distribute narcotics for him to further his drug trafficking organization. These individuals are believed to obtain narcotics from ERVING in the Chicagoland area and transport them back to the greater-Milwaukee area for subsequent distribution. ALLEN utilized her telephone, (262) 330-2333, and ERVING utilized his telephone, (773) 981-6881, to conduct these transactions. In addition, on at least one occasion, ALLEN utilized her vehicle, a black 2023 Chrysler Pacifica bearing Wisconsin registration AZW-6485, VIN: 2C4RC1BG5PR510973 (**Target Vehicle 1**), to travel to Chicago to meet with ERVING.

83. On February 13, 2026, the Honorable William E. Duffin, United States Magistrate Judge, Eastern District of Wisconsin signed a warrant authorizing the electronic surveillance of ALLEN's telephone (262) 330-2333 and ERVING's telephone (773) 981-6881. These warrants were executed on that same date. Also on February 13, 2026, the Honorable William E. Duffin also signed a warrant authorizing law enforcement to install a GPS device on ALLEN's **Target Vehicle 1**.

84. Case agents attempted to locate **Target Vehicle 1** for several days to execute the GPS warrant, with negative results. On February 21, 2026, case agents discovered that ALLEN's **Target Vehicle 1** was re-possessed by the lien holder of **Target Vehicle 1**. In addition, case agents monitored location data pertaining to the location of telephone (262) 330-2333 and discovered that it had not traveled to Chicago, IL since agents began to receive said location data. Therefore, based on training, experience, and the investigation into this matter, because ALLEN no longer had **Target Vehicle 1**, case agents believed ALLEN was not able to travel to Chicago, IL to meet with ERVING and it was likely MCDADE has someone else conducting drug transactions on his behalf.

85. On February 22, 2026, case agents reviewed a jail video call from MCDADE to JONES using the "Home Wave" application that occurred on February 12, 2026. The time stamp

on the screen of this video call was 05:48:10 p.m. During this call, it was apparent to case agents that JONES was driving in a vehicle. At the beginning of the call, MCDADE asked, “You read my e-mail?” JONES replied, “I can’t because I was been driving.” MCDADE also asked who JONES was with and she replied that she was with her mother. Approximately 7 minutes and 17 seconds into the call, case agents observed a highway sign in the background of the video. Based on experience and observations, the sign appeared to be a Chicago-area Express Lane sign. Case agents know that JONES is one of multiple people who MCDADE uses to conduct narcotics pickups from his source(s) in Chicago, believed to be ERVING. Case agents also know that JONES is known to drive Target Vehicle 2 based on prior surveillance.

86. Case agents reviewed electronic surveillance footage from the area identified by case agents as ERVING’s residence, 6318 S. Aberdeen Street, Chicago, Illinois, from February 12, 2026. At approximately 6:16 p.m., case agents observed what appeared to be a gray Nissan Pathfinder SUV, consistent with Target Vehicle 2, stop in front of ERVING’s residence. A black female with her hair in a short ponytail exited the passenger side of the vehicle, which was consistent with Target Vehicle 2 and walked toward ERVING’s residence, out of the view of surveillance. The SUV, consistent with Target Vehicle 2, then departed the area northbound, away from ERVING’s residence. Case agents believe the individual who exited the Pathfinder was consistent with JONES.

87. At approximately 7:15:57 p.m., electronic surveillance revealed that a dark sedan stopped in front of ERVING’s residence at which time its hazard lights were activated. At approximately 7:16:26 p.m., the same female, who was consistent with JONES, appeared from ERVING’s residence and entered the rear passenger side of the awaiting vehicle. This vehicle drove northbound away from the residence. Case agents believe that this was a rideshare vehicle (i.e. Uber or Lyft) and that JONES had left in it.

88. Case agents also checked license plate readers for Target Vehicle 2 for February 12, 2026. This query revealed that Target Vehicle 2 was captured on a highway camera on February 12, 2026, at approximately 3:14 p.m., travelling southbound on I-94 near Lake Forest, Illinois. At approximately 4:06 p.m., Target Vehicle 2 was also captured on a highway camera traveling southbound on I-90/I-94 at W. Chicago Avenue. This travel was in the direction of ERVING's residence.

89. Based on JONES' statement to MCDADE on the recorded video all, using (612) 525-0135, which indicted JONES was driving, case agents' observation that JONES appeared to pass a sign on I-94 in Illinois while she was driving, electronic surveillance, and traffic cameras showing Target Vehicle 2 in Chicago, case agents believe JONES traveled to Chicago in Target Vehicle 2. In addition, case agents believe JONES was dropped off at ERVING's residence to obtain narcotics on behalf of the MCDADE DTO. JONES' travel is consistent with known previous travels of other suspects in this investigation that are suspected of having traveled to ERVING's residence to obtain narcotics.

90. Case agents conducted telephone toll analysis and observed that JONES did not appear to contact ERVING on February 12, 2026, using (612) 525-0135. Therefore, case agents believe based on training and experience, that ERVING and JONES made contact with each other utilizing non-conventional methods such as FaceTime, iMessage, or other encrypted applications, none of which would appear on telephone tolls. Case agents are aware that those engaged in drug trafficking will often use non-conventional methods such as FaceTime, iMessage, or other encrypted applications, because drug traffickers believe they can evade law enforcement when using these communication methods.

91. On February 26, 2026, the Honorable Stephen Dries, United States Magistrate Judge,

Eastern District of Wisconsin, signed a warrant authorizing law enforcement to install a GPS device on JONES' Target Vehicle 2.

92. Case agents have continued to monitor jail calls placed by MCDADE. During several of these calls, ALLEN mentioned getting a new vehicle. For instance, on February 23, 2026, at approximately 4:04 p.m., MCDADE called ALLEN at (262) 330-2333, from the Milwaukee House of Correction (Jail call # 745760768_2025018513_02-23-2026_16-04-02_1-262-330-2333_9108). During this call, ALLEN said, "We gonna get this truck in the morning, put the rest of this money up for you." MCDADE replied, "That's what's up."

93. On February 25, 2026, at approximately 9:25 a.m., MCDADE called ALLEN at (262) 330-2333, from the Milwaukee House of Correction (Jail call # 745829634_2025018513_02-25-2026_09-25-14_1-262-330-2333_9108). During this call, MCDADE asked, "After this, what time you want me to call you?" ALLEN replied, "Naw baby, you can call me anytime, dude. I'm saying after I'm done talking to you I'm finna go jump in the shower, put on some clothes, call the U/I, go get my whip, go get it registered, run down there put some money on your books…"

94. Case agents know "whip" is a term often used to refer to a vehicle. Therefore, case agents believed ALLEN informed MCDADE that she was going to get her new vehicle that day and register it with the Department of Motor Vehicles. Case agents subsequently conducted a query with the Department of Transportation and discovered that on this same date, February 25, 2026, ALLEN registered a bronze 2009 Nissan Murano, currently bearing Wisconsin license plate BCX-5254, VIN: JN8AZ18W99W152835 (Target Vehicle 3) to herself at 2843 North 10th Street, Milwaukee, Wisconsin.

95. On February 27, 2026, case agents conducted surveillance at ALLEN's residence, 2843 North. 10th Street, Milwaukee, Wisconsin. At approximately 1:11 p.m., case agents observed

a bronze Nissan Murano (Target Vehicle 3) parked directly behind her residence. This Murano displayed temporary Wisconsin license plate Y5912J in its rear window (Target Vehicle 3). Case agents conducted a query with the WI DOT and discovered this temporary license plate was registered to above-mentioned vehicle (Target Vehicle 3). Case agents believe ALLEN was initially provided with the temporary license plate (Y5912J) for Target Vehicle 3 until she could receive the permanent license plates (BCX-5254) for Target Vehicle 3.

96. Case agents believe now that ALLEN has a vehicle again (Target Vehicle 3), MCDADE will continue to employ her to meet with ERVING in Chicago, IL and travel to other locations to engage in drug trafficking matters on behalf of the MCDADE's DTO. For example, during the February 25, 2026, ALLEN stated she was going to "put the rest of this money up for you." Based on training, experience, and the investigation into the DTO, case agents believe this statement refers to ALLEN securing MCDADE's drug proceeds. In the other call from the same date, ALLEN states she will "run down there" in order to "put some money on your books…" Based on training, experience, and the investigation into the DTO, case agents believe this statement refers to ALLEN driving Target Vehicle 3 to the House of Correction ("run down there") in order to provide MCDADE with his drug proceeds. Case agents are aware that the term "books" often refers to an inmate's account, which allows inmates to make telephone calls and purchase items. Based on this information, case agents believe ALLEN is placing drug proceeds on MCDADE's inmate account to allow MCDADE to make additional telephone calls, including calls related to drug trafficking, or obtain items while in custody ("put some money on your books…").

**D. Location of Target Vehicle 1**

97. Case agents attempted to locate **Target Vehicle 1** for several days to execute the GPS warrant, with negative results. On February 21, 2026, case agents discovered that ALLEN's **Target**

**Vehicle 1** was re-possessed by the lien holder of the vehicle. In addition, case agents monitored location data pertaining to the location of Allen's Target Cell Phone 8 and discovered that it had not traveled to Chicago, IL since agents began to receive said location data. Therefore, because ALLEN no longer had **Target Vehicle 1**, case agents believed ALLEN was not able to travel to Chicago, IL to meet with ERVING.

98. Case agents contacted the City of Milwaukee Tow Lot to locate **Target Vehicle 1**. Through information provided by the Milwaukee Tow Lot, case agents learned **Target Vehicle 1** was repossessed on February 11, 2026. Case agents were also given contact information for the company that maintains the lien on **Target Vehicle 1**, Foursight Capital.

99. Case agents contacted Foursight Capital to locate **Target Vehicle 1**. A representative with Foursight Capital gave case agents the location of **Target Vehicle 1** as well as consent to search the vehicle and utilize a K9 narcotics detection service dog on **Target Vehicle 1**. Case agents were notified **Target Vehicle 1** was repossessed by Wisconsin Repossessors and **Target Vehicle 1** was towed and stored at Manheim Milwaukee, 561 27th Street, Caledonia, Wisconsin. Case agents contacted Manheim Milwaukee and confirmed that **Target Vehicle 1** is being stored at their location. Case agents made a formal request to Manheim Milwaukee to secure **Target Vehicle 1** for further inspection by law enforcement. Manheim Milwaukee agreed to secure **Target Vehicle 1** and preserve **Target Vehicle 1** for further inspection by law enforcement.

100. Give case background and facts that establish probable cause to believe that the electronically stored information described in Attachment B (e.g. connected device information, historical GPS data, etc.) is recorded on **Target Vehicle 1's** infotainment and telematics systems. Case agents know the owner and primary operator of **Target Vehicle 1** was Victoria ALLEN. Case

agents also know a 2023 Chrysler Pacifica utilizes the "Uconnect" vehicle infotainment and connectivity platform. Case agents queried information about Uconnect and learned it is difficult, if not impossible, to remotely erase information from a vehicle's Uconnect. Because **Target Vehicle 1** was towed and repossessed without ALLEN's prior knowledge, case agents believe ALLEN has been unable to erase her data from **Target Vehicle 1's** infotainment system. Therefore, case agents believe any and all information stored on **Target Vehicle 1** from ALLEN's and others' telephones remains on its Uconnect platform and is accessible to download pursuant to this warrant.

101. Case agents inputted the VIN number of **Target Vehicle 1** into Berla software, a forensic program that can be utilized to conduct a forensic analysis. Case agents learned that data typically stored and available on the exact model of **Target Vehicle 1** includes, but is not limited to, the Entertainment Telematic module, Personal Assistance and Safety Services, Vehicle Tracking Module, and the Cell Phone Hands Free Module. Case agents believe obtaining this data could assist in identifying cellular telephone numbers linked to **Target Vehicle 1**, contact information in telephones linked to **Target Vehicle 1**, and locations **Target Vehicle 1** traveled to/from.

102. Case agents believe from all the above information that MCDADE, ALLEN, and others utilized **Target Vehicle 1** during their drug trafficking, including meeting with known and unknown co-conspirators, even as MCDADE is in custody. Case agents further believe ALLEN, and other known and unknown DTO members, using **Target Vehicle 1** have made frequent visits to locations in which the DTO stores and distributes narcotics and/or pick up drug proceeds or location directed to do so by MCDADE and others including likely meeting drug sources. Case agents believe that the information requested in this warrant will assist in identifying potential other sources of supply, distributors, and locations associated with the DTO.

103. Further, I know that people who engage in ongoing criminal drug trafficking utilize motor vehicles, like **Target Vehicle 1**, to further their activities. I know that traffickers utilize vehicles to travel to locations in which they engage in their drug trafficking, such as meeting drug customers, sources of supplies, and other co-conspirators. I also know that drug traffickers will also use vehicles to travel to locations in which they store and distribute controlled substances, like stash houses or trap houses. Case agents believe based on the ongoing investigation into the DTO that the requested information regarding **Target Vehicle 1** will assist in the investigation of the DTO.

104. Case agents are aware that **Target Vehicle 1** is equipped with infotainment and telematics systems. As described in detail below, electronic data, information, and images stored on these systems may be successfully extracted from **Target Vehicle 1** using proprietary hardware and software.

105. Currently, **Target Vehicle 1** is located at Manheim Milwaukee, 561 27th Street, Caledonia, Wisconsin. Case agents have been provided consent by Foresight Capital to seize and search the requested information; however, out of abundance of caution case agents seek the court's authority to seize and examine the infotainment and telematics systems.

## TECHNICAL BACKGROUND REGARDING TARGET VEHICLE 1 AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

106. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

a. Many modern motor vehicles (such as Target Vehicle 1) are equipped with sensors,

cameras,[3] transmitters, and electronic control units (ECUs)[4] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[5] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

b. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

c. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

d. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

e. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access,

---

[3] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[4] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

[5] The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

f. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

g. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h. To complete a forensic extraction from **Target Vehicle 1**, it may be necessary, temporarily, to remove trim and other components of **Target Vehicle 1** to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within **Target Vehicle 1**. In the event that potentially destructive processes are required to perform this extraction, parts of **Target Vehicle 1** may be destroyed and rendered useless.

i. Furthermore, it may be necessary to return to **Target Vehicle 1** and reconnect the infotainment and telematics systems to **Target Vehicle 1**'s power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

j. The requested warrant authorizes a later review of the media and information seized or copied from **Target Vehicle 1**, which review may continue past the date required for execution of the warrant.

107. In conclusion your affiant believes, given the technical capabilities of **Target Vehicle**

**1** on board computer system, evidence contained in the vehicle will help to identify perpetrators and potential co-conspirators and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations. Based on the foregoing, your affiant requests the proposed search warrant.

## ATTACHMENT A

**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. A black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973, currently located at Manheim Milwaukee, at 561 27th Street, Caledonia, Wisconsin (**Target Vehicle 1**); and
2. In-Vehicle Infotainment (IVI) system and/or Telematics devices of a black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AZW-6485, and VIN 2C4RC1BG5PR510973 (Target Vehicle 1).

# ATTACHMENT B

## Items and Information to be Seized and Searched
## MATTER NUMBER 2024R438

The following materials, which constitute evidence of the commission of a criminal offense, contraband, or property designed or intended for use or which is or has been used to assist in obtaining the means of committing a criminal offense, namely violations of possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846; use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b), (hereinafter referred to collectively as the "TARGET OFFENSES);

1. Regarding the search of the Black 2023 Chrysler Pacifica minivan, bearing Wisconsin license plate AWZ-6485, VIN 2C4RC1BG5PR510973 (**Target Vehicle 1**), this search warrants seeks to seize:
    a. All Applications such as any device information, connections and System Metadata retained by **Target Vehicle 1**'s telematics and infotainment systems.
    b. All Events and Navigation logs retained by the vehicle's telematics and infotainment systems.
2. Regarding the search of the electronic systems listed in item #1 above, this search warrant seeks to seize evidence of violations of possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846; use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b), (hereinafter referred to collectively as the "TARGET OFFENSES" including but not limited to:

a. Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the Subject Vehicle 1, including, but not limited to:

    i. unique identifiers for the devices that connected to **Target Vehicle 1**, including cellular phones;
    ii. contact lists and call logs corresponding to paired devices;
    iii. media files, which could include voice and text messaging;
    iv. unique identifiers for mass storage devices connected to the **Target Vehicle 1** and histories for the devices;
    v. odometer readings;
    **vi.** logs of phone calls; and logs for locations and routes that **Target Vehicle 1** traveled;
    vii. SMS;
    viii. Bluetooth connections;
    ix. USB connections;
    x. voice commands;
    xi. voice recordings;
    xii. voice calling;
    xiii. web browser history;
    xiv. Wi-Fi connections;
    xv. speech recognition;
    xvi. time updates;

xvii. track logs;

xviii. traction events;

xix. traffic updates;

xx. stop/start log;

xxi. GPS warnings;

xxii. hard acceleration;

xxiii. hard braking;

xxiv. light status;

xxv. odometer reading;

xxvi. gear shifts;

xxvii. historical navigation data;

xxviii. historical speed data;

xxix. historical event data; and

xxx. data streaming services and related content.